PFIZER INC., Plaintiff,

v.

ASTRA PHARMACEUTICAL
PRODUCTS, INC.,
Defendant.

No. 92 Civ. 752 (AGS).

United States District Court,
S.D. New York.

Aug. 3, 1994.

**1308**

Patterson, Belknap, Webb & Tyler, New York City, Thomas C. Morrison, Steven A. Zalesin, George W. Evans, William J. Goebelbecker, of counsel, for plaintiff Pfizer Inc.

Liddy Sullivan Galway Begler & Peroff, P.C., New York City, Andrew V. Galway, Charles E. Yon, Mildred M. McLaney, Marsha G. Ajhar, for defendant Astra Pharmaceutical Products, Inc.

OPINION AND ORDER

## TABLE OF CONTENTS

BACKGROUND .......................................... 1309
1. The Parties, Their Dispute and Their Products ...... 1309
 (a) Pfizer and PROCARDIA XL ..................... 1309
 (i) Pfizer's Adoption of the XL Mark: Is It Descriptive? ... 1311
 (b) Astra's TOPROL .............................. 1312
 (i) Astra's Adoption of the XL Mark .......... 1312
2. Has XL Acquired Secondary Meaning? ............... 1313
3. Uses of the XL Mark and Evidence of Confusion ..... 1313
 (a) Product Distribution, Packaging and Sales ... 1313
 (b) Uses of XL In the Marketplace on Other Products ... 1314
 (c) Lack of Evidence of Actual Confusion ....... 1315
4. History of Proceedings ............................ 1315
DISCUSSION ............................................ 1316
1. Standard for Summary Judgment ................... 1316
2. Availability of Trademark Protection ............. 1317
 (a) The Unregistered XL Mark ................... 1317
 (b) The Registered PROCARDIA XL Mark .......... 1317
3. Pfizer's Allegation of Infringement .............. 1317
4. XL is Descriptive ................................ 1318
5. XL Has Not Acquired Secondary Meaning .......... 1318
 (a) Survey Evidence ............................ 1320
 (b) Unsolicited Media Coverage ................. 1321
 (c) Attempts to Plagiarize ..................... 1322
 (d) Third Party Uses .......................... 1322
 (e) Conclusion ................................ 1322
6. There Is No Evidence of Likelihood of Confusion .. 1322
 (a) Strength of the Mark ...................... 1322
 (b) The Degree of Similarity Between the Two Marks ... 1323
 (c) The Proximity of the Products ............. 1324
 (d) Bridging the Gap .......................... 1325
 (e) Actual Confusion .......................... 1325
 (f) Defendant's Good Faith .................... 1325
 (g) Quality of Defendant's Product ............ 1326
 (h) Sophistication of the Consumers ........... 1327
 (i) Balancing the Factors ..................... 1328
7. There is no Basis for a Family of Marks ......... 1328
8. Summary Judgment is Appropriate on Plaintiff's State Law Claims ... 1328
CONCLUSIONS .......................................... 1330

---

SCHWARTZ, District Judge:

Defendant, Astra Pharmaceutical Products, Inc. ("Astra") moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment. For the reasons set forth below, defendant's motion is granted.[1]

1. The Court has considered the substantial submissions of the defendant in support of its mo-

*BACKGROUND*

This action is brought by Pfizer Inc. ("Pfizer"), one of the nation's largest pharmaceutical companies and manufacturer of cardiovascular drugs called PROCARDIA and PROCARDIA XL, against Astra, an American subsidiary of a Swedish pharmaceutical company with a substantial market share in Europe and significant sales in the United States, and manufacturer of the cardiovascular drug called TOPROL XL. The complaint seeks injunctive relief, damages, product recall and attorneys fees under several causes of action including: (1) infringement of the registered PROCARDIA XL trademark in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) infringement and unlawful misappropriation of the unregistered XL trademark under New York common law; (4) unlawful dilution of the distinctive quality of Pfizer's unregistered XL trademark and injury to Pfizer's business reputation under New York General Business Law § 368–d; and (5) unfair competition under New York common law. The heart of Pfizer's complaint is that Astra's use of the XL mark on its product, TOPROL XL, is likely to cause confusion as to the origin or sponsorship of the goods at issue and, therefore, violates the Lanham Act.

The facts concerning the drugs at issue are, in all material respects, uncontested although the parties dispute their significance. The parties contest (1) whether XL, as used by Pfizer, is a suggestive or a descriptive mark, (2) whether XL has acquired secondary meaning, and (3) whether Astra's use of XL on its TOPROL XL product is likely to cause confusion as to the origin or sponsorship of TOPROL XL.[2]

As detailed below, Astra has met its burden of proving that there exists no genuine issue of material fact and that summary judgment is appropriate. Specifically, the Court concludes that there is no genuine issue of material fact that: (1) XL as used on Pfizer's extended release cardiovascular drug is descriptive; (2) XL lacks secondary meaning; and (3) even if XL is a suggestive mark, or a descriptive mark that has acquired secondary meaning, there is no likelihood of confusion. In sum, the Court concludes that no rational jury could find in favor of Pfizer in this case because the evidence in support of Pfizer is so slight that there is no genuine issue of material fact and a grant of summary judgment is, therefore, proper. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–34 (2d Cir. 1994).

1. *The Parties, Their Dispute and Their Products*

(a) *Pfizer and PROCARDIA XL*

In 1982 Pfizer introduced PROCARDIA, a cardiovascular drug used primarily for the treatment of angina. The active ingredient in PROCARDIA is nifedipine, a calcium channel blocker (which works by blocking calcium pathways thereby causing blood vessels to dilate). PROCARDIA has, by all accounts, been highly successful; in 1989,

tion for summary judgment, the equally substantial submissions of plaintiff in opposition thereto, the arguments of counsel made at an oral argument held on March 3, 1994 and the following unsolicited submissions to the Court made after this motion was fully submitted: (1) letter dated September 14, 1993 to the Court from Thomas C. Morrison, counsel to plaintiff; (2) letter dated January 21, 1994 to the Court from Thomas C. Morrison; (3) letter dated February 4, 1994 to the Court from Andrew V. Galway, counsel to defendant; (4) letter dated February 8, 1994 to the Court from Thomas C. Morrison; (5) defendant's "Submission For Oral Argument on Astra's Motion For Summary Judgment" (submitted to the Court at the March 3, 1993 oral argument); (6) letter dated May 5, 1994 to the Court from Thomas C. Morrison; (7) letter dated

May 11, 1994 to the Court from Andrew V. Galway; and (8) letter dated May 16, 1994 to the Court from Thomas C. Morrison. The Court has also considered (a) Pfizer's Motion to Supplement Summary Judgment Record dated May 27, 1994 (which it hereby grants) and the supporting, papers and (b) Astra's Reply to Plaintiff's Motion to Supplement Summary Judgment Record dated June 8, 1994.

**2.** Since the Court concludes that Astra's use of XL on TOPROL XL does not infringe any trademark right of Pfizer's, or otherwise violate federal or state law, the Court does not address Astra's alternative argument that its use of XL constitutes fair use pursuant to 15 U.S.C. § 1115(b)(4).

PROCARDIA achieved U.S. sales in excess of $400 million.

It is uncontested that PROCARDIA is a registered trademark of Pfizer and that Pfizer is the exclusive user of the PROCARDIA mark in commerce in the United States.

While the record is silent with respect to the precise expiration date(s) of Pfizer's patent(s) on PROCARDIA, the parties agree that the patent(s) with respect to PROCARDIA expired in the late 1980s or early 1990s. In September 1989, Pfizer obtained Food and Drug Administration ("FDA") approval to market a new product it had developed containing nifedipine, the active ingredient in PROCARDIA. The new product featured a patented drug release or delivery system known as the gastrointestinal therapeutic system ("GITS").[3] GITS utilizes a controlled release tablet which emits a continuous and steady dosage of the active ingredient into the bloodstream over a 24 hour period.

In October 1989, Pfizer introduced its new nifedipine product under the brand name PROCARDIA XL. PROCARDIA XL is an extended release version of PROCARDIA. By using the GITS delivery system, patients need only take one tablet a day instead of several tablets per day. Additionally, because of the GITS delivery system, PROCARDIA XL produces consistent blood levels of nifedipine. Finally, the GITS delivery system enables PROCARDIA XL to be used for hypertension and angina whereas PROCARDIA is only used for angina.

The timing of PROCARDIA XL's release and Pfizer's marketing strategy was widely commented upon in the press. Pfizer was concerned that competition would erode the success of PROCARDIA once the PROCARDIA patent(s) expired. Consequently, Pfizer began marketing PROCARDIA XL (whose GITS delivery system remains patented and thus not subject to competition) prior to the expiration of the PROCARDIA patent(s) in order to wean PROCARDIA users off of the old product and onto the new product. Notably, Pfizer priced PROCARDIA XL at a significant discount—roughly 18% below the price of PROCARDIA.

Pfizer's marketing efforts and planning were highly successful. PROCARDIA XL's sales, like PROCARDIA's sales, have been extraordinary. In its first full year on the market, PROCARDIA XL's sales exceeded $400 million, the highest level of sales reached by PROCARDIA during its first seven years on the market. In 1991, PROCARDIA XL's sales were $785 million, and in 1992 sales exceeded $1 billion. Moreover, plaintiff's allegations in its Second Amended Complaint dated November 9, 1992 (the "Complaint"), that PROCARDIA XL is one of the two best selling cardiovascular drugs in the United States and one of the five best selling prescription drugs in any category are uncontroverted. Similarly, defendant has not challenged the statement made by Marie–Caroline Sainpy, Vice–President of Marketing of Pfizer Labs, a division of Pfizer Inc., in her declaration dated April 29, 1993 ("Sainpy Declaration"), that "PROCARDIA XL is currently the best-selling cardiovascular drug, and the second best-selling prescription drug of any type, in the United States." Sainpy Declaration at ¶ 7.

PROCARDIA XL is a registered trademark of Pfizer and Pfizer is the exclusive user of the PROCARDIA XL mark in commerce in the United States. For purposes of this motion, Astra does not dispute that "PROCARDIA XL" (as opposed to "XL") has acquired secondary meaning. Moreover, it is undisputed that Pfizer has spent many millions of dollars to advertise and promote PROCARDIA XL. Pfizer, however, has not sought to register the mark "XL" with the U.S. Patent and Trademark Office (the "PTO")[4], nor has it spent any money to

---

**3.** Pfizer does not hold the GITS patent. Pfizer is a licensee under a license from the Alza Corporation ("Alza") providing for the exclusive right to use GITS in connection with a nifedipine product.

**4.** Pfizer asserts, and Astra does not dispute, that the PTO will not permit registration of a compo-

nent ("XL") of a compound mark ("PROCARDIA XL") unless that component is used independently. However, under FDA law, the full name of a drug must be used. As discussed below, the absence of registration is not a bar to protection under the Lanham Act.

advertise or promote the XL mark separate and apart from PROCARDIA XL.

### (i) Pfizer's Adoption of the XL Mark: Is It Descriptive?

According to Pfizer, XL does not convey an immediate idea of the characteristics of an extended release cardiovascular drug—*i.e.*, it is not merely descriptive—but rather "suggests" extended duration and excellence. The Sainpy Declaration states:

> Pfizer chose PROCARDIA XL as the tradename for its nifedipine GITS product for a variety of reasons. PROCARDIA was an established brand name, and Pfizer wished to capitalize on its goodwill with physicians. However, Pfizer also wanted its tradename to suggest that the product was not merely an extended release version of PROCARDIA, but a new and unique dosage form with benefits distinct from other long acting drugs. It therefore rejected commonly used suffixes such as LA, and chose a term—XL—that had never been used in the medical community or the pharmaceutical industry. XL was chosen because it had the ability to *suggest* the essential selling features of the product: the fact that it had an extended delivery profile, that it was an "excellent" or superior product, and that it was different from all other extended release cardiovascular drugs.

Sainpy Declaration at ¶ 3 (emphasis added). These assertions are echoed throughout Pfizer's submission and the deposition testimony of Pfizer's representatives.

What is also clear from Pfizer's submissions is that Pfizer uses XL as "a symbol" for the GITS delivery system. And, according to Pfizer, "XL does not merely denote a garden-variety extended release mechanism; it symbolizes the technologically advanced, controlled delivery system, and the benefits it confers to PROCARDIA XL." *Id.* at ¶ 10. Importantly, the GITS delivery system uses POLYPLASDONE XL, a chemical bonding agent patented by Alza and a registered trademark of GAF Corporation. Alza and GAF have been using the XL suffix in connection with the bonding agent for the GITS delivery system since as early as 1976.

Pfizer also relies on the results of a telephone survey that it commissioned in November 1987 to help it select a name for its new PROCARDIA product as evidence that XL is suggestive of the product's characteristics (the "Pre–Litigation Survey"). The objective of the survey was to evaluate three proposed suffixes (CR, TR and XL) for Pfizer's new product. Doctors were told that the sponsor was considering names for a "new and unique oral dosage form of PROCARDIA" and were asked "Suppose the new name were PROCARDIA XL, what does the suffix *XL* imply to you? What do you think it means?" Roughly two-thirds of the physicians surveyed responded that XL implied or meant "extra length" or "extended-life." [5]

Finally, Pfizer dismisses the relevancy of the sixth edition of the *Medical Abbreviations Dictionary* (1993), which defines XL as (1) "extended release (once a day oral solid dosage form)" and (2) "extra large". Pfizer claims that to the extent this entry implies that XL is a common descriptive suffix, the entry is either a mistake or merely shows that Pfizer has popularized XL to the point where the authors elected to include the term in their most recent edition. Pfizer also contends that when it adopted the XL mark it was not defined as meaning extended release because XL had no such meaning in medicine at that time. [6]

---

**5.** It is undisputed that in the pharmaceutical industry "CR" is descriptive and means controlled release, "LA" is descriptive and means long acting, "SR" is descriptive and means sustained released, "TR" is descriptive and means time release and "QD," from the latin words *quaque die*, is descriptive and means "per day". Additionally, and without specifically admitting that the following suffixes are descriptive, one or both of the parties have referred to the following suffixes: "ER," apparently meaning extended release, "XR," apparently also meaning extended release and "CD," apparently meaning controlled dosage.

**6.** By way of background, at the preliminary injunction hearing, Pfizer relied on the fifth edition of the *Medical Abbreviations Dictionary* (1990), which defined XL only as extra large, to show that from the time Pfizer chose its mark through the commencement of this action, XL had no generally recognized meaning in medicine. Astra relies on the sixth edition of the *Medical Abbreviations Dictionary* to show the descriptive

Astra asserts that the evidence shows as a matter of law or undisputed fact that XL is a descriptive mark and has not achieved secondary meaning. Astra points to several items including (1) numerous dictionary references, such as the *Medical Abbreviation Dictionary,* as well as definitions contained in general dictionaries for XL which include "extra long", "extra large", and "extended life" and (2) numerous uses of XL in the marketplace, including in connection with health care and medical products. Finally, Astra persuasively argues that the very evidence that Pfizer touts as proving that XL is suggestive (the admissions of Pfizer's employees and the Pre–Litigation Survey), in fact, illustrates that XL is descriptive. *See* Discussion–§ 4 *infra.*

### (b) *Astra's TOPROL*

In January 1992 Astra launched TOPROL XL. TOPROL XL is a sustained-release, one-a-day dosage form of a metoprolol antianginal/antihypertensive drug. TOPROL XL is a beta blocker. Thus, both TOPROL XL and PROCARDIA XL are prescription, one-a-day cardiovascular drugs indicated for hypertension and angina. TOPROL XL has achieved $50 million in sales since the product was launched (approximately $25 million per year). While Astra has advertised and promoted TOPROL XL, it has failed to provide the Court with information as to the amount that it has actually spent on advertising and promotion. In response to the Court's questioning at the March 3, 1994 oral argument (the "Oral Argument"), both parties agreed that TOPROL XL's presence in the marketplace has had no significant impact on the sales of PROCARDIA XL. *See* March 3, 1994 Oral Argument Transcript ("Oral Argument Transcript") at 29–30; 48.

### (i) *Astra's Adoption of the XL Mark*

Pfizer alleges that Astra's use of the XL mark is a blatant bad faith attempt to plagiarize, thereby indicating both secondary meaning and likelihood of confusion. Specifically, Pfizer contends that Astra adopted the XL mark to trade on Pfizer's goodwill. Astra, however, contends that it adopted XL, a descriptive suffix, in conformity with industry

nature of the mark and the absence of secondary

practice and the plain meaning of the acronym XL.

Pfizer's allegations in this regard are not supported by any evidence. It is undisputed that Astra initially applied for trademark protection and submitted labelling to the Food and Drug Administration ("FDA") for the mark TOPROLOL LA. However, in July 1991, the FDA objected to the name TOPROLOL LA on the grounds that the mark was too close to the generic name of the drug, metoprolol succinate. It is also undisputed that in the fall of 1991, Astra commissioned Jordan Research to conduct a survey among physicians (20 physicians were interviewed) to assist in the selection of a new name (the "Jordan Report"). The survey tested the following suffixes: XL, CR, LA and SR and doctors responded favorably and/or unfavorably to each suffix.

As a threshold matter, the Court observes that plaintiff has mischaracterized the Jordan Report's findings. Specifically, Pfizer quotes the following language from the section of the Jordan Report entitled "Statement of Purpose" to the Court "it 'seemed quite possible that in the year since the original marketing research, *especially because of the heavy promotions of ... PROCARDIA XL,'*" this "'newer'" suffix "'might have gained in favor over the older designation L.A.'" Declaration of Steven A. Zalesin dated April 30, 1993 at ¶ 9 (emphasis added in declaration). In point of fact the complete quote is as follows: "It seemed quite possible that in the year since the original marketing research, especially because of the heavy promotions of *Cardizem SR and Procardia XL, one of the newer suffixes* might have gained in favor over the older designation 'LA.'" Jordan Report (emphasis added). This distinction is significant.

Astra has submitted evidence that it chose XL because it was a commonly used acronym for extra long and it was the industry practice to use descriptive designators. The Declaration of Charles E. Yon, General Counsel for Astra, dated January 31, 1992 (the "Yon Declaration") states:

meaning.

... the basis of the decision to use 'XL' in association with TOPROL was the belief on the part of Astra that "XL is a commonly-used acronym for 'extra long', which thereby conveys the message that its TO-PROL XL product is an extra long or extended release formulation. It was the belief of Astra, when the FDA required it to change its name from TOPROLOL LA to something else ... that TOPROL XL was a trademark which avoided the problems that concerned the FDA and was at the same time a marketable term identifying an extra long acting or extended release formulation.

. . . . .

It is common practice for companies marketing a pharmaceutical product with an extra long acting delivery system to use a commonly recognized acronym following the brand name in order to distinguish the longer acting product from the basic product.

Yon Declaration at ¶¶ 6; 18. Mr. Yon's statements concerning the wide use of XL and Astra's motivation for using XL on its product are echoed throughout Astra's submissions. Furthermore, when Astra selected the TOPROL XL mark, it followed its uniform and standard practice of having outside counsel search and clear the mark prior to usage. *Id.* at ¶ 5.

Ultimately, Astra selected the name TO-PROL XL and in November 1991 filed a trademark application for TOPROL XL. On January 10, 1992 the FDA approved the product; the product was then launched. During the prosecution of the trademark and the course of this case, Astra disclaimed any exclusive right to use the "XL" portion of the TOPROL XL mark. Pfizer has opposed Astra's trademark application. The PTO has yet to act on the opposition, and TOPROL XL remains an unregistered mark.

2. *Has XL Acquired Secondary Meaning?*

In opposition to Astra's motion for summary judgment, Pfizer argues that Pfizer selected the "XL" mark because it suggested extended duration and excellence. In the alternative, Pfizer contends that the "XL" mark is a descriptive mark that has acquired secondary meaning (*i.e.*, it has become distinctive of Pfizer's goods in commerce) and, as such, is entitled to trademark protection.

In support of its argument that XL has become distinctive of Pfizer's goods in commerce, Pfizer points to, among other things: (1) the sales success of PROCARDIA XL; (2) the fact that from October 1989 to the introduction of TOPROL XL in January 1992, PROCARDIA XL was the only prescription drug sold under an XL designation; (3) the fact that Pfizer has spent over $400 million dollars to advertise and promote PROCARDIA XL; (4) "substantial unsolicited media coverage, including a significant number of articles that refer to the product as simply 'XL' "; and (5) a survey conducted by The Gallup Organization, Inc. ("Gallup" and the "Gallup Survey," respectively) which Pfizer states "provides definitive proof that physicians associate XL primarily with PRO-CARDIA and PROCARDIA XL, and only secondarily with the concept of extended relief." It is important to observe that none— or virtually none—of Pfizer's evidence of secondary meaning relates to the use of the XL mark alone; rather it relates to the use of the PROCARDIA XL mark. The two or three bits of evidence which are arguably XL specific are, as shown below, mischaracterizations of the record or without probative value.

Astra argues that Pfizer's secondary meaning argument must fail for two primary reasons. First, Astra relies on the updated version of the *Medical Abbreviations Dictionary* which defines XL as "extended release (once a day oral dosage form)" and "extra large". Second, Astra offers a sound and well reasoned critique of the Gallup Survey. *See* Discussion—§ 5 *infra.*

3. *Uses of the XL Mark and Evidence of Confusion*

(a) *Product Distribution, Packaging and Sales*

As stated above, TOPROL XL and PRO-CARDIA XL are prescription one-a-day cardiovascular drugs indicated for hypertension and angina; however, they have different

compositions and different delivery systems. While the parties apparently disagree with respect to whether the products may be prescribed interchangeably, there is no dispute that these products are only prescribed after a doctor's evaluation and are only dispensed with a doctor's prescription.

It is not disputed that the parties' marketing efforts are conducted in substantially similar ways through (a) advertising in medical journals, (b) mailings sent to doctors, and (c) the use of large forces of "detail men" who solicit doctors' at the latter's offices and discuss their products directly with the doctors. In most instances, references to PROCARDIA XL and TOPROL XL in the advertising and promotional literature are followed by references to their generic names, *i.e.*, nifedipine extended release or metoprolol succinate extended release. It is also not disputed that the packaging and the promotional literature for both TOPROL XL and PROCARDIA XL include the words "Extended Release Tablet" and that both companies emphasize their advanced delivery system. Pfizer agrees that the TOPROL XL and PROCARDIA XL packaging and promotional literature generally include the Astra and Pfizer housemarks, respectively.[7] Further it is not disputed that Pfizer highlights the XL portion of the PROCARDIA XL mark on virtually all of its packaging and promotional literature.

Additionally, it is undisputed that pharmaceutical companies use suffixes to describe characteristics of their products. *See* n. 5,

*supra* (listing certain suffixes used by pharmaceutical companies). Moreover, the parties agree that since at least 1950, pharmaceutical companies have concentrated on producing products that are capable of delivering drugs over an extended period of time and that, the delivery system has become an important element of the product. Pfizer did not disagree with the Court's observation that "[w]hat you are trying to do is identify in a shorthand way a function. So we have 'long-acting,' we have 'sustained release,' we have different letters and words which in short form tell the consumer that this product does not require taking repeated dosages during the day but can through one dose sustain the release or the delivery of the pharmaceutical product in the system." Oral Argument Transcript at 36–37. That this is a fact is illustrated by the following cardiovascular drugs, each of which use a descriptive suffix: DILACOR XR, CARDIZEM CD and INDERAL LA.

Finally, it is not disputed that the presence of TOPROL XL in the marketplace has had no adverse impact on the sales of PROCARDIA XL.

#### (b) *Uses of XL In the Marketplace on Other Products*

Defendant concedes that prior to the introduction of PROCARDIA XL in 1989, XL had not been used on prescription drugs. Today, Pfizer is the only pharmaceutical company (other than Astra) to market a prescription drug product with XL in the United States.[8]

---

**7.** The Declaration of Charles E. Yon, General Counsel of Astra, dated March 11, 1993, includes the averment that the FDA requires all manufacturers and distributors of pharmaceuticals to be identified on the packaging.

**8.** XL, however has been used on two prescription drugs marketed abroad, ADIXEM XL and NIFENSAR XL. NIFENSAR XL, like PROCARDIA XL, is an extended release formulation of nifedipine. Pfizer maintains that these overseas trademarks, particularly NIFENSAR XL, are obvious examples of plagiarism of Pfizer's mark, further demonstrating the strength of the mark and secondary meaning. Additionally, VIOKASE XL was registered as a mark in the United States for a digestive aid. However, it appears that the VIOKASE mark was never used and the registration was cancelled in 1985. Moreover, in December 1991, Boehringer Ingelheim Pharmaceu-

ticals, Inc. ("Boehringer") filed with the PTO an application to register the mark CATAPRES XL for an antihypertensive pharmaceutical product based on anticipated use. Pfizer asserts that CATAPRES is a widely used cardiovascular drug that *competes directly with* PROCARDIA XL. On November 12, 1992, perhaps in response to a March 9, 1992 protest letter sent by Pfizer, Boehringer withdrew their application to register CATAPRES XL. Finally, American Home Products has a pending application with the PTO for PROTAIN XL. Pfizer has indicated its intention to oppose that application. At the Oral Argument, counsel for Astra, informed the Court that it was his understanding that American Home Products and Pfizer have an agreement whereby the outcome of the Court's decision in this matter will be determinative of the PROTAIN XL dispute.

It is also not disputed, however, that certain health care and medical products (other than prescription drugs) use an XL suffix as part of the product's tradename. Importantly, as noted above, Alza has licensed Pfizer to use the GITS delivery system in PROCARDIA XL. The GITS delivery system uses POLYPLASDONE XL, a chemical bonding agent patented by Alza. Several Alza patents make reference to a bonding agent known as POLYPLASDONE XL. Moreover, it is uncontested that the POLYPLASDONE XL mark was registered to GAF Corporation in 1981 for a "chemical suitable for use as a binder and/or disintegrant medicines." The Certificate of Registration indicates that GAF first used the mark in January 1976. Thus, Alza and its predecessor were using XL as part of the name of the bonding agent used in GITS (which Pfizer touts as PROCARDIA XL's most important selling feature) for over a decade prior to Pfizer's use of XL on its product.[9]

Other health care and medical products that use XL as a suffix include PERMALENS XL and SOLA XL for extended-wear contact lens products. *See also* n. 9, *supra.* Finally, XL is widely used on a variety of commercial goods such as the well known DURACELL XL long acting battery. *See Oreck Corp. v. U.S. Floor Systems, Inc.,* 803 F.2d 166, 170 (5th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987) (XL is "widely used on a variety of commercial goods, including cameras, computers, automobiles, audiotapes and chainsaws").

#### (c) *Lack of Evidence of Actual Confusion*

PROCARDIA XL and TOPROL XL have been on the market coextensively for approximately 30 months and hundreds of thousands of prescriptions have been written for these products. Despite Pfizer's concerns, there has been no evidence of actual confu-

sion as to the source of these products or misprescription. Pfizer, however, points to the following factors in support of its argument that there is a likelihood of confusion regarding the source, affiliation or connection of TOPROL XL: (1) XL is a strong mark as evidenced by the factors cited in support of their argument that XL has acquired secondary meaning; (2) XL is used identically on PROCARDIA XL and TOPROL XL; (3) the fact that "PROCARDIA XL and TOPROL XL are both one-a-day prescription cardiovascular drugs indicated for hypertension and angina that are sold through identical channels of commerce and are advertised and promoted in substantially the same way;" (4) their contention that the drugs compete for prescriptions; (5) surveys conducted by DataTactics, Inc. ("DataTactics" and "DataTactics Survey", respectively) and Oxtoby-Smith, Inc.,[10] which Pfizer asserts show a confusion rate of approximately 15 percent; (6) Astra's lack of good faith in adopting the XL mark; (7) their contention that doctors do not generally know who manufactures or sells the drugs they prescribe; and (8) testimony of an "expert" "that a significant percentage of doctors are likely to be confused about the source or affiliation of TOPROL XL."

#### 4. *History of Proceedings*

Plaintiff initiated this action on January 20, 1992 seeking injunctive relief, product recall, corrective advertising and damages. Judge Conboy conducted a preliminary injunction hearing on January 31, February 7 and February 10, 1992 (collectively, the "Preliminary Injunction Hearing"). On February 20, 1992, Judge Conboy denied plaintiff's request for preliminary injunctive relief, finding, among other things, that there was little (if any) credible evidence in the record before

---

**9.** Pfizer contends that there are genuine issues of fact as to whether PROCARDIA XL and POLYPLASDONE XL are marketed in the same field of commerce, and whether doctors who are prescribers of cardiovascular drugs have ever heard of POLYPLASDONE XL. There is no dispute, however, that the GITS delivery system used by Pfizer uses POLYPLASDONE XL.

**10.** The Oxtoby–Smith survey was originally submitted to the Court at the preliminary injunction hearing. This survey was severely criticized by Judge Kenneth Conboy. The Court rejects the Oxtoby–Smith survey for the reasons set forth in Judge Conboy's decision. *See Pfizer Inc. v. Astra Pharmaceutical Products, Inc.,* No. 92 Civ. 752, slip op. at 4–5 (S.D.N.Y. Feb. 20, 1992) (the "Preliminary Injunction Opinion").

the court of likelihood of confusion, no evidence of actual confusion, an extremely sophisticated targeted product selection group, and only marginal and inconsequential similarity between the rival marks when viewed in their entirety.

On November 10, 1992, Pfizer filed a Second Amended Complaint. The amended complaint eliminated any reference to alleged medical harm to a patient whose physician is confused about the source or affiliation of TOPROL XL. Indeed, Pfizer now agrees that there is little likelihood of misprescription or dispensing error as between TOPROL XL and PROCARDIA XL.[11]

## DISCUSSION

### 1. Standard for Summary Judgment

Summary judgment is appropriate where, as here, Astra has proven that there is no issue of material fact and no rational jury could find in favor of Pfizer. In reaching this conclusion, the Court is mindful of the Second Circuit's recent admonitions and reiterations of the standard for summary judgment in *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219 (2d Cir.1994). In *Gallo,* the Court set forth the following test:

> First, summary judgment may not be granted unless 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists.... In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought.... Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.... When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight,

there is no genuine issue of material fact and a grant of summary judgment is proper.... Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.

22 F.3d at 1223–24 (citations omitted). The Court also observes that the Second Circuit has in the past affirmed the use of summary judgment in a trademark infringement case using language similar to *Gallo.* Chief Judge Oakes, in *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576 (2d Cir.1991), affirming a grant of summary judgment in an action brought under § 43(a) of the Lanham Act, observed:

> As the Supreme Court explained in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." A dispute as to a material fact is "genuine," and hence summary judgment is not appropriate, under this standard, only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510.

*Id.,* 949 F.2d at 580 (emphasis in original) (also citing the following cases affirming the use of summary judgment in trademark cases: *Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 115 (2d Cir. 1984); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 (2d Cir. 1986); *Murphy v. Provident Mutual Life Ins. Co.,* 923 F.2d 923, 930 (2d Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991)).

■ Finally, on a motion for summary judgment the moving party must initially

---

**11.** The initial complaint, contained a claim for medical harm in that doctors would be misled into believing that TOPROL XL offers the same delivery system and benefits as PROCARDIA XL and that prescription error and harm to patients would ensue.

satisfy its burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case (and as discussed above, all ambiguities are resolved in the nonmoving party's favor). *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.E.2d 202 (1986) ("In sum, we conclude that the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case").

### 2. *Availability of Trademark Protection*
#### (a) *The Unregistered XL Mark*

■ "XL" is not a registered trademark. Pfizer, therefore, relies on § 43(a) of the Lanham Act which prohibits any person from using

> in connection with any goods ... or any container for goods, ... any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person.

15 U.S.C. § 1125(a) (1994).[12] " '[I]t is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registra-

tion under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).' " *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 (2d Cir.1992) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992)). Thus, the critical inquiry is whether the use of XL by Astra on TOPROL XL is likely to cause consumer confusion with respect to the source or sponsorship of the product. Before the ultimate issue of confusion is addressed, the threshold question of whether this is a trademark that deserves protection must be considered. *See Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985); *see also Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987).

#### (b) *The Registered PROCARDIA XL Mark*

Pfizer alleges a cause of action pursuant to § 32 of the Lanham Act for infringement of the registered PROCARDIA XL trademark. Section 32 provides, in pertinent part:

> (1) Any person who shall, without the consent of the registrant—
>
> > (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion,* or to cause mistake, or to deceive; or
> >
> > (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribu-

---

12. As the Second Circuit explained in *Bristol–Myers,* the above quoted language "was added in 1988 by P.L. 100–667, Title I, § 132, and replaced the original § 43(a) which had been enacted in 1946. The Senate Report accompanying the amendment indicates that the intent of the new language was to "codify the interpretation [section 43(a)] has been given by the courts." Senate Report No. 100–515, reprinted

in 1988 U.S.Code Cong. & Admin.News 5577, 5603; see *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, —— n. 18, 112 S.Ct. 2753, 2765 n. 18, 120 L.Ed.2d 615 (1992) (Stevens, J. concurring). Thus our precedents predating the new language remain in force." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1038 n. 1 (2d Cir.1992).

tion or advertising of goods or services on or in connection with which such use is *likely to cause confusion,* or to cause mistake or to deceive.

shall be liable in a civil action by the registrant ...

15 U.S.C. § 1114 (1994) (emphasis added).

### 3. *Pfizer's Allegation of Infringement*

Although Pfizer's Complaint pleads two federal claims—one for infringement of its registered PROCARDIA XL trademark under § 32 of the Lanham Act, 15 U.S.C. § 1114, and a second for infringement of its unregistered XL mark under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)—Pfizer focuses on the infringement of the XL mark. Indeed, Pfizer does not allege that TOPROL XL infringes its "PROCARDIA" mark or the "PROCARDIA" portion of the PROCARDIA XL mark. For example, in the section of Pfizer's Complaint entitled "Pfizer's Injury", all references are to injury as a result of Astra's alleged appropriation of the XL mark. *See* Complaint at ¶¶ 18–19; ¶ 21 (Illustratively, ¶ 18 states: "Pfizer has invested substantial resources to establish within the health care community the advantages of *a product labelled "XL".* By appropriating *the XL designation* for TOPROL, Astra is facilitating the introduction and sale of its own product and is trading upon the value which Pfizer established for *the XL mark ")* (emphasis added).

■ Similarly, Pfizer's Local Rule 3(g) Statement focuses on the XL mark. Additionally, Pfizer's Memorandum in Opposition to Astra's Motion for Summary Judgment dated April 30, 1993 ("Pfizer's Memorandum in Opposition") criticizes Astra's motion because it "ignores the core issue in this case: whether Pfizer owns a trademark in the term "XL" as applied to prescription cardiovascular drugs, and whether that trademark is infringed by Astra's use of the identical term on its competing product, TOPROL XL ... [Astra] never confronts the central issue of whether XL itself—either because it has acquired secondary meaning or because it is suggestive—functions as a trademark." Pfizer's Memorandum in Opposition at 1–2. Indeed, Pfizer now emphasizes that it is *not*

asserting that TOPROL XL infringes its PROCARDIA XL mark. Pfizer's Memorandum in Opposition at 31–32. Pfizer is bound by the limitations asserted in its Rule 3(g) statement and its brief.

Pfizer's proof, unlike its argument, however, focuses on the PROCARDIA XL mark and not the XL mark. Thus, while Pfizer argues that the XL mark has acquired secondary meaning, the proof that it submits relates to advertising expenditures and sales success, among other things, of PROCARDIA XL, and not XL alone. Similarly, Pfizer's proof with respect to certain of the factors considered in the likelihood of confusion analysis relates to PROCARDIA XL, and not XL alone. For example, the evidence submitted and the arguments made by Pfizer with respect to the proximity of the products, actual confusion and the quality of the products compares PROCARDIA XL and TOPROL XL. This inconsistency (between Pfizer's argument that the mark at issue is XL and its submission of evidence with respect to PROCARDIA XL) arises because there is no product using the mark XL alone.

### 4. *XL is Descriptive*

■ A trademark is defined in 15 U.S.C. § 1127 as including "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." In determining whether a mark is worthy of trademark protection, it must be capable of distinguishing the trademark holder's goods from those of others. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992). The first step in determining whether a mark is worthy of protection is to classify the mark. Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976), wrote, "[a]rrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes [of terms] are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful."

These categories of marks have been defined and described as follows:

> [g]eneric terms—"the common descriptive name of an article or substance" . . .—are ineligible for any trademark protection. Descriptive marks, those "describ[ing] the qualities, ingredients, effects or other features of the product naturally and in ordinary language" . . . are protectible only where secondary meaning can be established. Suggestive terms require "imagination, thought and perception to reach a conclusion as to the nature of goods," . . . and are eligible for protection without proof of secondary meaning. Finally, arbitrary or fanciful marks "enjoy all the rights accorded to suggestive terms as marks—without the need of debating whether the term is 'merely descriptive' and with ease of establishing infringement."

*Thompson Medical Co.,* 753 F.2d at 212–13 (citations and footnotes omitted).

■ The Second Circuit has recently reiterated the characteristics that distinguish descriptive marks from suggestive marks:

> A descriptive mark is one that " 'forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.' " . . . "[A] term can be descriptive in two ways. It can literally describe the product, or it can describe the purpose or utility of the product." . . . A term is suggestive " 'if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods.' "

*Bristol–Myers,* 973 F.2d at 1040 (citations omitted). Thus, a descriptive mark "is one that tells something about a product, its qualities, ingredients or characteristics. It may point to a product's intended purpose, its *function* or intended use, its size, or its merit." *Gruner & Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993) (emphasis added) (citations omitted). The Court also observes that in determining whether or not a mark is suggestive or descriptive, the Court should "look, not to the owner's subjective intent, but to the natural interpretation the public would give the word." *See Leathersmith of London, Ltd. v. Alleyn,* 695 F.2d 27, 30 n. 4 (1st Cir.1982),

*cert. denied,* 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983) (citations omitted).

■ Under this legal standard, XL is descriptive. The undisputed facts of this case lead to this inevitable conclusion. Pfizer's patents relating to PROCARDIA, an extraordinarily successful product, were to expire. Pfizer, as virtually every major pharmaceutical manufacturer, has for the past fifty years been engaged in the development of sustained release delivery systems. These systems are commonly advertised and appended as suffixes to the name of the product. Pfizer, in an understandable effort aimed at maintaining PROCARDIA's sales, offered PROCARDIA in sustained release form, advertising that fact and denominating its product PROCARDIA XL. The suffix XL was designed to, and did, describe the new product as one that has a sustained release or extended delivery system. Under these circumstances, the natural and inevitable conclusion is that XL is descriptive.

Pfizer argues that "XL" is suggestive because it does not immediately convey the characteristics of the cardiovascular drug but, instead suggests extended duration and excellence. Pfizer's argument fails for several reasons.

First, Pfizer uses XL as a modifier to its well known brand name PROCARDIA and, as required by the FDA, PROCARDIA XL is followed by its generic name, nifedipine extended release. Thus, Pfizer uses XL as a descriptive suffix—Pfizer uses XL to describes the utility, purpose, function, qualities and characteristics of its product.

Second, as Judge Conboy recognized and as discussed above, there is a "widespread practice in the drug industry to *functionally* identify long acting medicines with . . . suffixes." Injunction Opinion at 5 (emphasis in original); see also n. 5, *supra.*

Third, the sixth edition of the *Medical Abbreviations Dictionary* defines XL as "extended release (once a day oral solid dosage form)" and "extra large." Moreover, the *Medical Abbreviations Dictionary* makes no mention of Pfizer or PROCARDIA XL in defining XL. And, indeed, general dictionaries define XL as "extra long," "extra large"

and "extended life". *See Nestle Co. v. Chester's Market, Inc.,* 571 F.Supp. 763, 777 (D.Conn.1983), *vacated on other grounds,* 756 F.2d 280 (2d Cir.1985) ("presence of a term in the dictionary is often treated by courts as persuasive evidence of how a term is understood and used by the consuming public") (citations omitted); *see generally* Declaration of Lawrence J. Raphael dated March 8, 1993 (submitted by Astra and detailing dictionary references to XL).

Fourth, while PROCARDIA XL is the first prescription drug to use the suffix XL, it is not the first product in the health care and pharmaceutical industry to use XL. POLY-PLASDONE XL, which is used in PROCARDIA XL's GITS delivery system, was first used as a mark in 1976 and was registered as a mark in 1981. *See* Background–§ 3(b) *supra.* XL is also widely used outside the pharmaceutical industry.

Fifth, the findings of the Pre–Litigation Survey, contrary to plaintiff's contentions, indicate that the term is descriptive for two reasons. The survey clearly shows that Pfizer was considering descriptive suffixes. And the results of the survey indicate that the term XL is descriptive: approximately two-thirds of the physicians surveyed responded that XL implied or meant "extra length" or "extended-life".

Finally, and similar to the results of the Pre–Litigation Survey, the testimony of Dr. Susan Schwartz McDonald, Pfizer's marketing consultant, at the preliminary injunction hearing and at her deposition further indicates that the term XL is descriptive. As Judge Conboy observed, Dr. McDonald "conceded that the market perceives the "XL" suffix as signifying a prolonged dosage, much like other common drug suffixes, and product excellence in general, but not the GITS per se." Preliminary Injunction Opinion at 4 (citing Preliminary Injunction Hearing Transcript at 200–204); *see also* Sainpy Declaration at 3 (quoted *supra* ).

The Court finds that there is no genuine issue of material fact concerning whether XL is descriptive and that no rational jury could find that the mark is suggestive.

### 5. *XL Has Not Acquired Secondary Meaning*

■ Since XL is descriptive, proof of secondary meaning is required for protection. *See Two Pesos,* ── U.S. ──, 112 S.Ct. at 2757. " 'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Bristol–Myers,* 973 F.2d at 1039 (citing *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2187 n. 11, 72 L.Ed.2d 606 (1982)).

As the Second Circuit has stated:

the crux of the doctrine of secondary meaning "is that the mark comes to identify not only the goods but the source of those goods," even though the relevant consuming public might not know the name of the producer. [*20th Century Wear, Inc. v. Sanmark–Stardust, Inc.,* 815 F.2d 8, 10 (2d Cir.1987) ] ("[C]onsumers often buy goods without knowing the personal identity or actual name of the [producer]."). Nonetheless someone seeking to establish secondary meaning must show that the purchasing public associates goods designated by a particular mark with but a single-although anonymous-source. *Id.;* cf. 3 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* § 19.25, at 81–82 n. 7 (L. Altman 4th Ed. 1983) . . . ("It suffices if consumers accept the trademark as an indication of origin.").

*Centaur Communications,* 830 F.2d at 1221.

In determining whether a mark has acquired secondary meaning courts have examined the following factors: "advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use." *Bristol–Myers,* 973 F.2d at 1041 (*citing Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d at 217).

■ An analysis of whether XL has acquired secondary meaning exposes the fundamental flaw in Pfizer's § 43(a) argument and the overall correctness of Astra's position. XL is not a product that is sold independently. Rather, XL is always used in

conjunction with Pfizer's concededly well-recognized PROCARDIA trademark. As a result, there are no advertising expenditures with respect to XL—highlighting XL on certain promotional literature for PROCARDIA XL is not sufficient and indeed there is no evidence with respect to an XL-only advertising budget; there is no evidence of XL's sales success; and there is no evidence concerning the length and exclusivity of the use of the trademark XL independent from PROCARDIA. Moreover, the evidence submitted by Pfizer that is arguably XL specific is both questionable and trivial and fails to create a dispute issue of material fact, e.g., evidence with respect to unsolicited media coverage. Finally, the widespread practice in the drug industry to functionally identify long-acting medicines with suffixes, the entry for XL in the *Medical Abbreviations Dictionary* and the acknowledged use by others of the acronym XL—including with respect to POLYPLASDONE XL, a component of the GITS delivery system—rebuts the concept of secondary meaning.

As noted above, Pfizer adopted the descriptive term "XL" as part of an attempt to maintain the life of its PROCARDIA product after patent protections expired, and it did so consistent with industry practice concerning the use of descriptive suffixes. The suffix XL, as used by Pfizer and others, simply does not suggest a source of manufacture. There is no reason, in law or in equity, to protect this suffix under the undisputed facts. And, perhaps, most important, there is no evidence, after almost three years of competition between plaintiff and defendant, of any confusion in the minds of consumers as to the source of their respective products. In sum, Pfizer has submitted no evidence suggesting a material dispute as to the essential elements which would give rise to a finding of secondary meaning.

### (a) Survey Evidence

■ The Gallup Survey, after screening physicians, poses the following question: "Thinking of the practice of cardiovascular medicine, what first comes to mind when you hear the letters XL?" Seventy percent of the physicians immediately mentioned PROCARDIA or PROCARDIA XL. Roughly one physician in five (22%) indicated that XL is a drug suffix signifying "controlled release" or "extended release".

This survey does not support secondary meaning in the mark *XL alone* for several reasons. First, the survey results do not distinguish between PROCARDIA and PROCARDIA XL. It is conceded that PROCARDIA is an extremely successful cardiovascular drug and a well recognized trademark of Pfizer.

Second, the Gallup Survey is dated June 1992; at that time TOPROL XL had been on the market only approximately 6 months, while PROCARDIA XL had been on the market approximately 31 months and PROCARDIA had been on the market approximately 10 years. Indeed, Pfizer has not disputed the statements of Astra's expert, Ivan Ross, that PROCARDIA XL was the only XL-suffixed brand having significant presence in the market at the time of the survey. It is not probative of secondary meaning for respondents to have responded with one of the two best known drugs on the market and the only drug on the market of any significance that used XL.

Third, the Gallup Survey—both the questions asked and the screening questions—conditioned physicians to respond with the name of a product rather than how the product functions or works, or the meaning of the acronym XL.[13] Thus, by asking a screening question with respect to the drugs the doctors prescribed, the doctors were conditioned to respond with the name of a product rather than a function. It is not probative of sec-

---

**13.** The following screening question, among others, was asked:

> In the past 12 months, have you written any prescriptions for the following therapeutic classes?
>> Antihistamine medications
>> Antidiabetic medications
>> Cardiovascular medications
>> Antibiotic medications

The screening questions were followed by questions including:

> Thinking of the practice of cardiovascular medicine, what first comes to mind when you hear the letters XL?

ondary meaning that physicians conditioned (or asked) to respond with a drug name responded with one of the most popular, if not the most popular, cardiovascular drug on the market and the only XL-suffixed brand having significant presence in the market at the time.

### (b) *Unsolicited Media Coverage*

It is beyond dispute that PROCARDIA XL has been the subject of hundreds if not thousands of references in lay, business and medical publications. Once again, those references are *not* to XL alone. Pfizer argues that there also have been a number of publications that refer to the product as XL. Pfizer's characterization of these articles is unfounded. All of the articles submitted by Pfizer refer to PROCARDIA XL as well as XL and a significant number of those articles refer to "the XL version" or "the XL formulation" or quote Pfizer's advertisements where Pfizer itself refers to the product as XL.

### (c) *Attempts to Plagiarize*

■■■ Pfizer also argues that Astra plagiarized Pfizer's use of the XL suffix. In support of this secondary meaning argument, Pfizer points to two Astra documents. First, the Jordan Report which assessed doctors' reactions to various comments. Pfizer writes: "[w]hen exposed to XL, physicians 'made favorable comments about their experience with PROCARDIA XL.' On the other hand, *not one* doctor said anything about 'extra long' or 'extra length.' " Neither the conduct nor the conclusions of the Jordan Report, which surveyed 20 physicians over the telephone, indicates that Astra was seeking to plagiarize Pfizer's mark or that Astra adopted XL in order to trade on Pfizer's goodwill. Doctors interviewed in the Jordan Survey made both favorable and unfavorable comments with respect to PROCARDIA XL as well as comments with respect to other drugs including Inderal LA and Cardizem SR. Moreover, one physician commented that XL "sounds like something 'extra' ".

The second document which Pfizer points to is a handwritten note from George Roadman, Astra's Vice President of Sales and Marketing, on a memorandum which states: "This is a tough sell. The parallel that Lars

will see is _____ XL (I forgot the extended release version that is ultrasuccessful)." Pfizer concludes that "there is no reason to believe that XL is any less distinctive among doctors than it is among Astra's own executives." Pfizer may not bootstrap a one-sentence handwritten note into a finding that there has been an attempt at illegal copying and secondary meaning.

The Court concludes that neither document is probative of bad faith or of an attempt to plagiarize the XL mark.

### (d) *Third Party Uses*

■■■ Pfizer argues that the fact that Procter & Gamble was considering a license of the XL mark (negotiations that were ultimately unsuccessful) supports a finding of secondary meaning. The Court rejects as a matter of law that this fact is indicative of secondary meaning. *See Lang,* 949 F.2d at 581 (rejecting concept of secondary meaning in the making). Similarly, Pfizer argues that Boehringer's abandonment of its plans to use the CATAPRES XL mark supports its argument that XL has acquired secondary meaning. Boehringer's withdrawal of its application as a result of Pfizer's demand letter is not evidence of its acceptance of XL as having acquired secondary meaning, nor is such action binding upon Astra.

### (e) *Conclusion*

■■■ In sum, there is insufficient evidence for a jury to conclude that consumers identify XL (as opposed to PROCARDIA XL) with the source of a nonexistent product called XL. In other words, no reasonable jury could find that XL has acquired secondary meaning.

### 6. *There Is No Evidence of Likelihood of Confusion*

■■■ Even if XL had acquired secondary meaning, which it has not, such a result would have only marginal significance because "[t]he bottom line is if no such likelihood of confusion is found, a defendant will generally not be held to have infringed plaintiff's mark." *Gruner & Jahr USA Publishing,* 991 F.2d at 1074.

In order to be confused, the public must be shown to believe that Pfizer, "sponsored or otherwise approved" the use of the XL trademark on TOPROL XL. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979); *see also Centaur Communications,* 830 F.2d at 1225 ("plaintiff must show a 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question'") (citations omitted).

In *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1984), the Second Circuit explained that the essence of confusion is the public's mistaken belief that the owner of the mark sponsored or otherwise approved of its use. The Court observed:

"[t]he harm to [the trademark owner]" ... "is the likelihood that a consumer, hearing the [similar sounding] name and thinking it had some connection with [the trademark owner] would consider [the product] on that basis. The [similar sounding] name therefore would attract potential customers based on the reputation built up by the [trademark owner] ... [T]he Lanham Act was designed to prevent a competitor from such a bootstrapping of a trademark owner's goodwill by the use of a substantially similar mark.

*Id.* at 872 (citations omitted); *see also Lang,* 949 F.2d at 579 ("Whether a trademark owner receives judicial protection depends on 'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'") (citations omitted).

▮▮ In determining likelihood of confusion the Court adheres to the nonexclusive list of factors set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), commonly referred to as the *Polaroid* factors:

the strength of the [prior owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap [between the two products], actual

confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* The foregoing list of factors "'does not exhaust the possibilities—the court may have to take still other variables into account' ... Moreover, 'no single Polaroid factor is determinative.' ... The proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists." *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993). As explained below, the Court concludes that an application of these factors to the facts of this case, reveals that Pfizer cannot possibly show confusion as to source or sponsorship and that no reasonable jury could return a verdict in favor of Pfizer.

### (a) *Strength of the Mark*

▮▮ "The strength of the mark is its tendency to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Centaur Communications,* 830 F.2d at 1225. The degree of the mark's distinctiveness depends upon whether it is arbitrary, fanciful, suggestive, descriptive or generic. *Id.* However, as the Second Circuit observed, "a mark's category is not alone controlling" "[r]ather, its strength should be examined in its commercial context." *Id.* at 1226; *see also W.W.W. Pharmaceutical Co.,* 984 F.2d at 572 (in analyzing the "origin-indicating quality" of a mark, "strength is assessed using two factors: (1) the degree to which it is inherently distinctive and (2) the degree to which it is distinctive in the marketplace") (citations omitted).

XL is, at best, a weak mark. First, as discussed above, XL is a descriptive mark and thus not inherently distinctive. Second, as discussed above, Pfizer has failed to demonstrate secondary meaning. *See, e.g., Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 122–27 (S.D.N.Y.1989) (the criteria used for determining the strength of the mark are similar to those used in assessing secondary meaning). There simply is no XL product; as a result, there is no evidence of advertising expendi-

tures or sales success with respect to XL independent from PROCARDIA. Moreover, the widespread practice in the drug industry to functionally identify long acting medicines with descriptive suffixes and the entry for XL in the *Medical Abbreviations Dictionary* reflects that XL is not distinctive in the marketplace.

(b) *The Degree of Similarity Between the Two Marks*

An obvious factor to be considered is whether the similarity of the marks is likely to provoke confusion. *See Lang,* 949 F.2d at 581; *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133 (2d Cir.1979). "In making this determination, a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." *Lang,* 949 F.2d at 581 (citing *McGregor–Doniger,* 599 F.2d at 1133–34).

The marks as used by the parties in their sale of cardiovascular drugs are not similar. First, neither party uses XL in isolation. PROCARDIA or TOPROL *always immediately precedes* XL. Additionally, the following factors, among others, ensure that despite the fact that both parties use XL on their cardiovascular product, there is no likelihood of confusion: (1) the widespread practice in the pharmaceutical industry to functionally identify long acting medicines with descriptive suffixes; (2) the general use of the Pfizer and Astra housemarks on TOPROL XL and PROCARDIA XL packaging and promotional literature; and (3) in most instances, references to PROCARDIA XL and TOPROL XL are followed by references to their generic names, *i.e.,* nifedipine extended release or metoprolol succinate extended release. *See generally Bristol–Myers,* 973 F.2d at 1046 (use of housemarks can dispel likelihood of confusion); *L.A. Gear, Inc. v. Thom McAn Shoe Co.,* 988 F.2d 1117, 1133–1134 (Fed.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993) (same and applying Second Circuit law); *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 309 (2d Cir.1972) (same).

Moreover, the way the products are marketed and sold to prescribing physicians must be factored into consideration in determining the similarity of the marks. As discussed above, it is not disputed that the parties' marketing efforts are conducted in substantially similar ways through (a) advertising in medical journals, (b) mailings sent to doctors, and (c) the use of "detail men" who are employed by the hundreds and who go to doctors' offices and discuss their products directly with the doctors. Significantly, Astra's submissions include testimony to the effect that it has over 175 representatives promoting TOPROL XL throughout the United States. Pfizer has submitted evidence that it has had as many as 1200 representatives assigned to promote PROCARDIA XL.

 Pfizer asserts that doctors frequently do not know which pharmaceutical company develops or puts out a particular product and thus "the fact that TOPROL XL is being promoted by an 'Astra' representative is unlikely to dispel any confusion a doctor may have about whether TOPROL XL and PROCARDIA XL are affiliated products or are put out by the same company." Pfizer's argument is neither logical nor consistent with well established principles of trademark law. While Pfizer has submitted evidence tending to show that some doctors do not know who manufactures a given drug, all a doctor needs to know, for purposes of dispelling any issue concerning likelihood of confusion, is that the doctor cannot order, receive information or obtain samples or other matter concerning TOPROL XL and PROCARDIA XL from the same detail person because the drugs come from different sources; the doctor does not have to be able to identify those sources.

Finally, Pfizer argues that "even if doctors do not believe TOPROL XL is manufactured or sold by Pfizer, they nonetheless may think it is being co-promoted or sold by Astra under a license." This supposition by an employee of Pfizer and not otherwise supported in the record, is, on its face, nothing more than mere conjecture and does not create an issue of material fact.

As the Second Circuit observed—in determining that the manner in which DRIZZLE and DRIZZLER trademarks were presented

on the parties' coats "reduce[d] to some degree the potential for confusion inherent in the close similarity between the two marks"—" 'the setting in which a designation is used affects its appearance and colors the impression conveyed by it.' " *McGregor–Doniger Inc.*, 599 F.2d at 1133–34 (citations omitted). Similarly, because of the manner in which PROCARDIA XL and TOPROL XL are marketed, sold and labelled, Astra's use of XL on its TOPROL XL product is not likely to cause confusion as to the source, origin or sponsorship of its product. *See McGregor–Doniger Inc.*, 599 F.2d at 1133 ("even close similarity between two marks is not dispositive of the issue of likelihood of confusion. 'Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question' ") (citations omitted).

### (c) *The Proximity of the Products*

■ This *Polaroid* factor measures whether the two products compete with each other. *Lang*, 949 F.2d at 582. "To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion." *Id.* Since this inquiry concerns whether it is likely that a prescribing physician would associate TOPROL XL with Pfizer, competitive proximity should not be analyzed in isolation but "should be measured, in part, with reference to the first two *Polaroid* factors." *Centaur Communications*, 830 F.2d at 1226 (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir.1987)).

Here both products are prescription cardiovascular drugs indicated for hypertension and angina and both use an XL suffix. Furthermore, the Court accepts as true Pfizer's argument that in most patients with common hypertension (high blood pressure) and/or angina, use of either product is appropriate. While the products compete, an analysis of whether there is competitive proximity for purposes of determining likelihood of confusion must be made in the context of the (1) strength of the XL mark and (2) the manner in which the products are presented to prescribing physicians. As noted above, those factors indicate that no confusion is likely. Additionally, it is black letter law that " 'no single Polaroid factor is determinative' ". *See W.W.W. Pharmaceutical Co.*, 984 F.2d at 574 (citations omitted).

### (d) *Bridging the Gap*

The question presented by this factor is the likelihood that Pfizer will enter Astra's market. *See W.W.W. Pharmaceutical Co.*, 984 F.2d at 573 (citations omitted). The Court accepts that PROCARDIA XL and TOPROL XL compete directly.

### (e) *Actual Confusion*

■ Evidence of actual confusion is a strong indication of likelihood of confusion. However, since actual confusion is difficult to prove, it is well-established that actual confusion need not be shown to prove confusion under the Lanham Act. *Lois Sportswear*, 799 F.2d at 875. However, "the complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor". *Id.* (citing *McGregor–Doniger*, 599 F.2d at 1136); *see also Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir.1983) ("no evidence of confusion for over a three-year period, during which substantial sales occurred, ... is a strong indicator that the likelihood of confusion is minimal") (citations omitted) (footnote omitted).

Despite approximately 30 months of coexistence, the writing of hundreds of thousands of prescriptions and $50 million in sales of TOPROL XL and over two billion dollars in sales of PROCARDIA XL, there is no evidence of a single instance of confusion with respect to the source, origin or sponsorship of TOPROL XL. Indeed, in response to a question by the Court in February 1992 at the Preliminary Injunction Hearing; Pfizer's witness, Dr. McDonald, testified that the longer the two drugs were in the marketplace, the likelihood of confusion would dissipate to the point where Pfizer's witness conceded "eventually there will be no source confusion". Preliminary Injunction Transcript at 224–225. Moreover, both parties agree that TOPROL XL's presence in the marketplace has had no significant impact on the sales of PROCARDIA XL.

Pfizer has submitted the DataTactics Survey in support of its argument of confusion. Survey evidence to support a finding of confusion is regularly relied upon by courts in analyzing actual confusion. *See PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 271 (2d Cir.1987). This Court, however, agrees with Judge Tenney's observation in *Reebok Int'l Ltd. v. K–Mart Corp.*, 849 F.Supp. 252, 268 n. 19 (S.D.N.Y. 1994), that while courts generally categorize consumer surveys as evidence of "actual confusion", this phrase, while "faithful to the language of Judge Friendly's list of eight *Polaroid* factors, ... does not accurately describe the nature of consumer surveys. Consumer surveys are probably better described as a statistical means of predicting the likelihood that actual consumers will confuse the products" and not as evidence of "actual confusion".

Pfizer's own survey actually shows a much lower percentage of confusion because of the use of the XL mark. The survey "finds" 63 respondents (or 21%) who said that it is likely that TOPROL XL and "PROCARDIA/PROCARDIA XL" are related—manufactured or marketed by the same company or affiliated or associated. Of those respondents, only 45 respondents (or 15% of the total respondents surveyed) found that likely relationship because of the letters XL, and only 38 respondents (or 12.67% of the total respondents surveyed) found that likely relationship because of the use of XL unrelated to Alza's prior use of XL in connection with the GITS delivery system.

Pfizer's survey concedes a 5.4% error or noise factor. When that noise is subtracted from the foregoing, the relevant overall confusion rate is only 7.27% (12.67% minus 5.4%).

Moreover these low confusion numbers occur in a survey replete with errors which make respondents *more likely* to find a relationship between TOPROL XL and PROCARDIA XL. As set forth above in Discussion–§ 3, and as specifically discussed in the context of secondary meaning and certain other *Polaroid* factors, Pfizer's evidence fails to distinguish between (a) PROCARDIA, (b) XL and (c) PROCARDIA XL. While Pfizer broadly claims infringement of its registered PROCARDIA XL trademark, Pfizer's Complaint, its Local Rule 3(g) Statement and its memorandum in opposition limits its claim to infringement of the unregistered XL mark. Pfizer's confusion survey is flawed because it has not tested for source confusion as a result of Astra's use of TOPROL XL with Pfizer's use of XL, but instead tested for source confusion as a result of Astra's use of TOPROL XL with Pfizer's use of PROCARDIA *and* PROCARDIA XL. Indeed the survey tests source confusion between PROCARDIA and TOPROL XL (something not at issue) and "proves" that there is source confusion between PROCARDIA (*without* the XL) and TOPROL XL where Pfizer concedes that such confusion is not at issue.

In sum (a) there has been a complete absence of actual confusion after 30 months of coexistence in the marketplace, (b) a Pfizer representative has made statements concerning the diminishment of any potential for likelihood of confusion the longer the two products are in the marketplace, (c) there has been co-existence in the marketplace without significant impact on the sales of PROCARDIA XL, and (d) the DataTactics Survey is flawed.

### (f) Defendant's Good Faith

■ This factor " 'looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.' " *Lang*, 949 F.2d at 583 (citations omitted). The Court is aware that, generally, issues of good faith are inappropriate for determination on summary judgment. *Id.; W.W.W. Pharmaceutical Co. v. Gillette Co.*, 14 U.S.P.Q.2d 1333, 1334, 1989 WL 206492 (S.D.N.Y.1989). Additionally, "[a]bsence of good faith, like the other Polaroid factors, is not by itself dispositive in any given case." *Bristol–Myers*, 973 F.2d at 1047, *citing Centaur Communications*, 830 F.2d at 1228 (" '[I]f comparison of the [marks] reveals no fair ... issue concerning the likelihood of confusion, then intent to copy, even if found from the proffered evidence, would not establish a Lanham Act violation.' ") (additional citations omitted).

Pfizer, in support of its contention that Astra adopted the XL mark in bad faith, points to: (1) the Statement of Purpose in the Jordan Report; (2) comments made by the FDA to Astra concerning the XL suffix; (3) instructions given to Astra's sales force to the effect that they should be prepared to answer questions about whether TOPROL XL uses the same delivery system as PRO-CARDIA XL; and (4) statements made at Astra's launch meeting. These items are addressed below.

As discussed above, the Court notes that counsel has misquoted the Jordan Report. The plain meaning of the Statement of Purpose in the report is that since the FDA rejected TOPROLOL LA, Astra was testing whether a different trademark (including a different suffix) would be preferable.

Second, the plain meaning of the document submitted by Pfizer with respect to the FDA's reaction to the XL suffix indicates no nefarious motive by Astra.[14]

Third, Astra prepared for its sales force a series of anticipated questions from doctors and model responses. These questions and answers included "[d]oes TOPROL XL use the same delivery system as PROCARDIA XL?"[15] There were also similar questions and responses based on comparisons to other drugs.

Fourth, Pfizer also states that PROCAR-DIA XL was a topic of discussion at two sales meetings that Astra had in preparation for the launch of its product. Specifically (1) PROCARDIA XL's sales successes were depicted at the sales meeting; (2) the TOPROL XL sales force was told to "recall the PRO-CARDIA XL" example and to "keep that in the back of your minds as really what we can

go for"; and (3) the sales force was also told that "we're confident that the XL benefit will pay off for us". While the record is ambiguous as to whether these statements were made at the launch meeting, the Court will assume that they were made.[16] These statements are innocent on their face. The fact that one pharmaceutical company pointed to the phenomenal success of another pharmaceutical company does not establish bad faith or illegal conduct.

Moreover, "[g]ood faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *W.W.W. Pharmaceutical Co.,* 984 F.2d at 575. Prior to adopting the TO-PROL XL mark, Astra followed its uniform and standard practice of having outside counsel search the mark. Counsel conducted a trademark search and provided an opinion letter stating that the proposed mark was available for use and registration.

Finally, Astra's adoption of the TOPROL XL Mark must be addressed in context. Astra intended to call its metoprolol product TOPROLOL LA. In July of 1991 the FDA objected to the product name. Eventually in October of 1991, the FDA approved TO-PROL XL, a trademark search was done, an opinion of counsel was received, a trademark application was filed and the product was launched in January of 1992.

### (g) *Quality of Defendant's Product*

Courts have taken two approaches with respect to the quality of the junior user's product: "(1) an inferior quality product injures the senior user's reputation because people may think they come from the same source; or (2) a product of equal quality

---

**14.** Astra Pharmaceutical Products Inc., Inter-Office Memo dated October 18, 1991 from Michael J. Fox, M.D. to George Roadman and Bill Albrecht, copy to Lars Bildman, re: Metoprolol ER: Trade Name:

> As you know, we had a successful meeting with the FDA yesterday (October 17, 1991) regarding the package insert and the trade name for Metoprolol ER. A detailed summary of the meeting will follow. However, with respect to the trade name, they have agreed to the name "Toprol" with the suffix LA or XL. Bob Walters of the FDA thinks that "XL" suffix has

> been trade marked, in which case there is no choice and the name would be "Toprol LA". If in fact that suffix has not been trade marked, the choice would then be between those two. I have no position on this and obviously the decision is yours anyway....

**15.** The answer consisted of an explanation of the two products' delivery systems.

**16.** Pfizer provided the Court with its Requests for Admissions dated January 21, 1993 but did not provide Astra's responses to those requests.

promotes confusion that they come from the same source." *Nikon, Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir.1993); *see also Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259–60 (2d Cir.1987) ("senior user may sue to protect his reputation even where the infringer's goods are of top quality") (citations omitted). The record contains no evidence that TOPROL XL is inferior to PRO-CARDIA XL. The record also contains no evidence that the quality of the respective products contributes to a likelihood of confusion. In fact, while Pfizer initially claimed medical harm, Pfizer now agrees that there is little likelihood of misprescription or dispensing errors.

(h) *Sophistication of the Consumers*

■ This factor requires the Court to assess likelihood of confusion by examining the level of sophistication of the consumers. The sophistication of consumers militates against a finding of confusion (though, that is not always the case). *See Centaur Communications*, 830 F.2d at 1228. The consumers here are doctors, as sophisticated a group as one could imagine. Moreover, the sales efforts are through direct sales contacts.

(i) *Balancing the Factors*

■ The Court concludes after weighing each of the *Polaroid* factors in the context of the other factors, that no reasonable jury could find a likelihood of confusion as to the source of TOPROL XL and Pfizer's XL product—in significant part because Pfizer does not have an XL product. While Pfizer vigorously contends that summary judgment is inappropriate because likelihood of confusion is a question of fact, in deciding this motion for summary judgment the Court is mindful that the ultimate burden of showing likelihood of confusion is Pfizer's. *W.W.W. Pharmaceutical Co.*, 984 F.2d at 570–71 ("In order to prevail on its claims of false designation of origin under 15 U.S.C. § 1125(a) [Lanham Act § 43(a) ] or trademark infringement under 15 U.S.C. § 1114 [Lanham Act § 32] ... [Pfizer] must show a likelihood of confusion") (footnote omitted).

■ Astra, the party moving for summary judgment, has met its burden of showing an absence of any genuine issue as to any material fact and adequate time for discovery has been provided. The determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case. In a trademark infringement and unfair competition case where the plaintiff seeks, among other things, damages and injunctive relief, plaintiff must, at trial, prove likelihood of confusion by a preponderance of the evidence. Pfizer, the party opposing summary judgment, has failed to make a showing sufficient to establish the existence of an element essential to Pfizer's case (likelihood of confusion) on which it will bear the burden of proof at trial. Summary judgment is, therefore appropriate. *See Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

### 7. There is no Basis for a Family of Marks

■ The Court rejects, as a matter of undisputed fact under governing law, Pfizer's argument that the XL mark is entitled to protection because it forms the basis for a family of a marks. The Court, while considering Pfizer's submissions with respect to its intention to use XL as the suffix for a family of *prescription drugs*, observes that Pfizer's Complaint limits its allegations concerning a family of marks to the narrower field of *cardiovascular drugs*. *See* Complaint at ¶ 22 (claiming damages as a result of Pfizer's "inability to exploit the *XL mark on a family of cardiovascular drugs utilizing the GITS system* ") (emphasis added). Pfizer, other than its submissions with respect to the failed MINIPRESS XL negotiations, has offered no evidence regarding consumers' association of XL with the use of GITS in connection with cardiovascular drugs.

Judge Walker, in concluding that the McDonald's restaurant chain owned a family of marks using the formatives "Mc" and "Mac" followed by a generic food item, held that the existence of a family of marks turns "on the distinctiveness of the common formative component and other factors, including the extent of the family's use, advertising promotion, and its inclusion in a number of registered and unregistered marks owned by a single party." *McDonald's Corp. v. McBa-*

*gel's, Inc.,* 649 F.Supp. 1268, 1272 (S.D.N.Y. 1986); *see also McDonald's Corp. v. Druck and Gerner, DDS., P.C.,* 814 F.Supp. 1127, 1131 (N.D.N.Y.1993) (same). Based on that standard, Pfizer does not have a family of XL marks.

Pfizer has informed the Court that despite the collapse of license negotiations with Procter & Gamble, it is continuing efforts to develop MINIPRESS XL, a GITS-based extended release version of MINIPRESS, an immediate release cardiovascular drug. However, there is no evidence concerning the amount spent on advertising and promotion for MINIPRESS XL. In fact, Pfizer has informed the Court that while it has obtained FDA approval for the compound, marketing must await government approval of a commercial-scale manufacturing facility.

Pfizer has also informed the Court that it is developing two additional compounds—GLUCOTROL XL and TANDOSPIRONE XL—each of which utilizes the GITS controlled delivery system. With respect to GLUCOTROL XL, Pfizer recently informed the Court that on April 26, 1994, the FDA approved Pfizer's New Drug Application for GLUCOTROL XL, an extended-release formulation of glipizide, an anti-diabetes drug utilizing the GITS delivery system.

Notably, as with MINIPRESS XL, there is no evidence in the record concerning the volume of sales of GLUCOTROL XL, the amount spent on advertising and promotion for GLUCOTROL XL and whether or not the mark GLUCOTROL XL is a registered trademark (although registration is implied). Further, as discussed above, XL, the common formative component of the alleged family of marks, is a descriptive mark that is not distinctive and has not acquired secondary meaning.

■ The evidence submitted by Pfizer is insufficient to support its argument that XL forms the basis for a family of marks and that XL is entitled to protection on that basis. This is true irrespective of when the Court looks to determine whether a family of marks exists, *i.e.,* the present or when TOPROL XL entered the marketplace. The Court, however, observes that the issue of the existence of the family of marks should

be judged at the time that the junior user entered the marketplace. *See* 3A Callmann *Unfair Comp. Trademarks & Monopolies* § 20.24 (L. Altman, 4th ed. 1993 & Supp. 1994) (collecting infringement cases and PTO opposition and cancellation proceedings where the court or the PTO denied the senior users' claim for a family of marks where the junior user adopted his mark after a senior users' first use but before the senior users' second use); *see also Talk to Me Products, Inc. v. Larami Corp.,* 804 F.Supp. 555, 563 (S.D.N.Y.1992), *aff'd per curiam,* 992 F.2d 469 (2d Cir.1993) (" 'Even if secondary meaning is acquired, it will not prevent the use of the term by one whose use had begun before the secondary meaning is acquired' ") (citations omitted); *accord Lang,* 949 F.2d at 582 (" '[T]he intent of the prior user to expand or [sic] its activities in preparation to do so, *unless known by prospective purchasers,* does not affect the likelihood of confusion' ") (citations omitted) (emphasis in original); *but see McDonald's Corp. v. Druck and Gerner, DDS., P.C.,* 814 F.Supp. 1127, 1133 (N.D.N.Y.1993) ("The Court therefore finds that the strength of Plaintiff's family of marks should be measured from a present standpoint").

■ When TOPROL XL entered the marketplace, Pfizer only marketed one product (PROCARDIA XL) with the XL designation. Presently Pfizer is in the earliest stages of marketing a second non-cardiovascular product and the status of a second cardiovascular product is, at best, unclear. There is no evidence in the record that consumers know of Pfizer's future plans for the XL mark. Finally, in light of the Second Circuit's rejection of the concept of "secondary meaning in the making", the concept of a family of marks in the making is rejected as a matter of law. *See Lang,* 949 F.2d at 581; *see also Cicena Ltd. v. Columbia Telecommunications Group,* 900 F.2d 1546, 1549–50 (Fed.Cir.1990) (discussing doctrine and concluding that the Second Circuit, if faced with the issue, would reject the doctrine of secondary meaning in the making). In sum, Pfizer's family of marks claim is defective as a matter of undisputed fact and as a matter of law.

### 8. *Summary Judgment is Appropriate on Plaintiff's State Law Claims*

■ Plaintiff also asserts causes of action under New York statutory and common law. First, plaintiff asserts a cause of action pursuant to § 368–d of the New York General Business Law. That statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods.

N.Y.Gen.Bus.Law. § 368–d (McKinney 1984).

This statute applies "only [to] those trade names which are truly of distinctive quality or which have acquired a secondary meaning in the mind of the public". *Bristol–Myers*, 973 F.2d at 1049 (citations omitted); *see also W.W.W. Pharmaceutical Co.*, 984 F.2d at 576–77 (holding that there are three elements to a dilution claim: (1) a distinctive mark; (2) likelihood of dilution; and (3) predatory intent). Moreover, in interpreting this statute, the Second Circuit has held that it "protects only extremely strong marks." *Bristol–Myers*, 973 F.2d at 1049 (citations omitted). As discussed above, XL is, at best, a weak mark. Thus, Pfizer is not entitled to protection under § 368–d.

■ Plaintiff has also asserted common law causes of action for unlawful misappropriation and unfair competition. "[T]he essence of unfair competition under New York common law is 'the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.'" *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 249–50 (S.D.N.Y.), *aff'd*, 923 F.2d 845 (2d Cir.1990) (citations omitted).[17]

Likelihood of confusion is a necessary element under New York common law of unfair competition. *See Bristol–Myers*, 973 F.2d at 1048. As discussed above, there is no likelihood of confusion arising out of Astra's use of TOPROL XL. Thus, Pfizer is not entitled to relief under a common law unfair competition theory.

### CONCLUSIONS

For the reasons set forth above, defendant's motion for summary judgment is granted.

SO ORDERED.

---

17. While plaintiff has alleged two separate common law causes of action, the misappropriation claim is, in fact, part of the unfair competition claim.